UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMY MAGEE,<br><br>            Petitioner,<br><br>      v.<br><br>KATHY MENDOZA-POWERS,<br><br>            Respondent. | 1:06-CV-01304 AWI GSA HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction on February 9, 2005, by jury trial of arson of property (Cal. Penal Code § 451(d)), felonious possession of flammable materials with intent to set a fire (Cal. Penal Code § 453(a)), felony terrorist threats (Cal. Penal Code § 422), misdemeanor possession of drug paraphernalia (Cal. Health & Saf. Code § 11364), and misdemeanor possession of less than one ounce of marijuana (Cal. Health & Saf. Code § 11357(b)). (LD-1[1].) It was also found true that Petitioner had a prior serious or violent felony

---
[1] "LD" refers to the documents lodged by Respondent with his answer.

conviction within the meaning of Cal. Penal Code §§ 667, 1170.12, and the he had previously served four prison terms within the meaning of Cal. Penal Code § 667.5(b). (LD 1.) Petitioner was sentenced to serve a total determinate term of six years and eight months. (LD 1.)

Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District (hereinafter "Fifth DCA"). On February 15, 2006, the Fifth DCA affirmed the judgment. (LD 5.) Petitioner then filed a petition for review in the California Supreme Court. (LD 6.) The California Supreme Court summarily denied review on March 17, 2006. (LD 6.)

On September 20, 2006, Petitioner filed a federal petition for writ of habeas corpus in this Court. On November 17, 2006, he filed the instant amended petition. He claims he received ineffective assistance of counsel because: 1) the public defender's office represented a prosecution witness, Marlena Bruce, in the past and therefore had a conflict of interest which prevented counsel from effectively representing him; and 2) defense counsel failed to impeach Marlena Bruce with two prior misdemeanor convictions. On July 30, 2007, Respondent filed an answer to the petition. On August 6, 2007, Petitioner filed a traverse to the answer.

**FACTUAL BACKGROUND**[2]

**Prosecution**

At approximately 2:00 a.m., on March 10, 2004, Claudia Johnson was at her residence on Eye Street in Bakersfield along with her six children and Frank Drohn, when City of Bakersfield fire department personnel, responding to a report of fire, arrived. Upon arriving, firefighter Ryan Groves found what appeared to be a flammable liquid burning on the ground, underneath a pickup truck nearby. He extinguished the fire.

The pickup belonged to Drohn, who inspected it after the fire was extinguished and observed that parts of the vehicle were blackened and/or burnt.

Johnson's residence was located approximately two and one-half blocks from a convenience store/gas station (the store). James Boyer testified to the following. He was working as a clerk in the store when, at approximately 1:08 a.m. on March 10, Petitioner entered and purchased a 32-ounce

---

[2] The facts are derived from the factual summary set forth by the Fifth DCA in its opinion of February 15, 2006, and are presumed correct pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1). (LD 5 at pp. 3-7.)

bottle of King Cobra malt liquor and 32 cents worth of gasoline. Petitioner left the store but he returned approximately one minute later and purchased an additional 68 cents worth of gasoline. Thereafter, Boyer saw Petitioner pump the gas into a "container," but Boyer could not determine what type of container it was. Boyer had seen Petitioner in the store previously.

On March 10, Marlena Bruce lived in an apartment on K Street in Bakersfield, approximately four blocks from Johnson's residence. Bruce testified to the following. On March 10, Petitioner was "staying" with Bruce in her apartment. Petitioner had a "romantic interest" in Claudia Johnson, and shortly after midnight on March 10, Bruce heard Petitioner speaking on the telephone to Johnson, whose voice Bruce could hear, "yelling" through the receiver. Petitioner told Johnson, "I will get a gun and I will kill [Frank Drohn,]" at which point Bruce took the telephone from Petitioner, hung it up and told him to leave. Petitioner then made another telephone call, during which he asked for $5 "for some gas" and $10 worth of "dope"; picked up a one gallon milk "jug"; rinsed it out; and, shortly before 1:00 a.m., left Bruce's apartment. Bruce went to sleep.

Bruce further testified to the following. She was awakened at about 2:00 a.m., by Petitioner "pounding at [her] door" and demanding entry. When Bruce let Petitioner in he stated he wanted to use the telephone to call Claudia Johnson. Bruce refused, at which point Petitioner became angry and "said he was going to set [Bruce's] house on fire like he did over there."[3] At that point Bruce "got [Petitioner] out of [her] house" and called 911. At some point before he left, Petitioner stated that he set "some vehicle" on fire at Johnson's residence.

Johnson testified to the following. She and Petitioner had been "best of friends only" for a period of approximately one year. Petitioner "[does not] like [Frank Drohn] because [Petitioner] likes [Johnson]." At some point on March 9, Petitioner telephoned Johnson and told her "[h]e wanted to burn [Johnson] and [her] kids out of the house."

Johnson further testified to the following. Shortly before 2:00 a.m. on March 10, a fireman came to her door. Johnson had been awakened "just a few minutes before" by a telephone call from Petitioner, during which Petitioner "just said he was sorry . . . ." Johnson "didn't know what he was

---

[3] Bruce was the victim of the criminal threat charged in count 3.

calling for." At some point before that, during the early morning hours of March 10, she had seen Petitioner standing in a parking lot located next to her driveway, drinking gin out of a bottle, and saying he wanted Drohn to "come outside." "[E]arlier," during a telephone call, Petitioner had said he "wanted to fight" Drohn.

Captain Edward Watts, an investigator with the Bakersfield Fire Department testified to the following. Responding to a dispatch call, he arrived at Eye Street at 2:25 a.m. on March 10, and learned from firefighters already on the scene that there had been a "vehicle fire" which had been extinguished. Thereafter, Captain Watts found, underneath the vehicle that had been involved in the fire, a "Molotov cocktail device" that had been "constructed from . . . a 32[-]ounce Cobra beer bottle." He also found "some material" inserted in the neck. This material, Captain Watts opined, had acted as a wick. He found similar material on the ground nearby. Inside the bottle was a liquid that, Captain Watts opined, was gasoline. No milk container was found at the scene of the fire.

Bakersfield police took Petitioner into custody on the morning of March 10, after which Captain Watts interrogated Petitioner. During that interrogation, Captain Watts testified, Petitioner stated the following. He bought a one-quart bottle of beer at the store at approximately 12:00 to 12:30 a.m. but he did not buy gasoline; he did not put gasoline in a milk jug; he did not construct a "fire bomb"; he did not go to Johnson's house after leaving the store; he was in the vicinity of Johnson's house on the evening of March 9, at which time he "had some words with Drohn; he did not threaten to set fired to Johnson's residence; he "[does not] threaten people"; he spoke to Johnson by telephone at approximately 11:30 p.m. on March 9, at which time she "told him not to call her any more"; and he had been a "guest" at Bruce's apartment but she "asked him to leave. . . ."

Captain Watts further testified to the following. During the interrogation, Watts noticed that the sleeves on the thermal T-shirt Petitioner was wearing were "tattered." Watts seized one of the sleeves. A police criminalist testified the sleeve material was "consistent" with the material inside the bottle found underneath Drohn's truck and on the ground near the bottle. Petitioner told Watts that Bruce's cat damaged one of the sleeves so Petitioner "used the box cutter on the other sleeve, so [both sleeves] would look the same."

Bakersfield Police Officer Terri Haynes testified to the following. At approximately 2:21

a.m. on March 10, in responding to a call, she made contact with Marlena Bruce, who told her the following. "[A]n acquaintance of hers by the name of Jimmy" had been at her apartment; he had asked him to leave; he "was angry"; he left, taking an empty "milk jug" with him; he stated he needed the jug because he "needed to get gas"; and he further stated "he was going to burn her out of her apartment."

At the time he was taken into custody Petitioner had in his possession a small amount of marijuana and a "small day pack" which contained a piece of glass tubing that could be used for smoking crack cocaine.

**Defense**

Petitioner testified that at some point on the evening of March 9 he was at Bruce's apartment, where he had been staying for approximately two to three weeks. He made "several" telephone calls to Johnson while he was there. During the last of these calls he "asked her if she could come out" but "she said she couldn't, because of Frank." Petitioner had been "friends" with Johnson for six years.

After leaving Bruce's apartment Petitioner went to Johnson's house, arriving at approximately 10:00 to 11:00 p.m. By that time, he had consumed approximately one-half of a fifth of vodka, and he was "drunk." He knocked on Johnson's door, but there was no response. From outside, he called to Johnson. Then, calling out to Drohn, he "told him to come out." Petitioner finished drinking the bottle of vodka and then walked to Bruce's apartment, arriving at approximately 11:00 or 11:30 p.m.

He then "[w]ent on an errand" for Bruce, returned 15 to 20 minutes later and called Johnson on the telephone. He "got loud" and he and Johnson argued. Petitioner then smoked some marijuana and, at approximately 12:00 or 12:30 a.m., Bruce "put [him] out." At that point, Petitioner walked to the store where he "bought some beer" and then "went to Yum-Yum Donuts." He stayed there until approximately 5:00 a.m., at which point a friend gave him a ride to another donut shop, where he stayed until he was arrested.

Petitioner did not "burn Mr. Drohn's truck"; buy gasoline at the store; have a milk carton in his possession at the store; threaten to "take a gun and kill [Drohn]'; or threaten Bruce. One of Bruce's cats tore one of the sleeves on his shirt, so he "tore it off." Later, with a box cutter, he cut off

the other sleeve.

The glass tubing found in Petitioner's day pack did not belong to him. He did not know how it got in his pack.

**DISCUSSION**

**I.  Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II.  Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

1  States" or "resulted in a decision that was based on an unreasonable determination of the facts in
2  light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,
3  538 U.S. at 70-71; see Williams, 529 U.S. at 413.

4  As a threshold matter, this Court must "first decide what constitutes 'clearly established
5  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,
6  *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court
7  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time
8  of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly
9  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by
10 the Supreme Court at the time the state court renders its decision." Id.

11 Finally, this Court must consider whether the state court's decision was "contrary to, or
12 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,
13 *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the
14 writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
15 question of law or if the state court decides a case differently than [the] Court has on a set of
16 materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.
17 "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state
18 court identifies the correct governing legal principle from [the] Court's decisions but unreasonably
19 applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

20 "[A] federal court may not issue the writ simply because the court concludes in its
21 independent judgment that the relevant state court decision applied clearly established federal law
22 erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A
23 federal habeas court making the "unreasonable application" inquiry should ask whether the state
24 court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

25 Petitioner has the burden of establishing that the decision of the state court is contrary to or
26 involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,
27 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states,
28 Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III.  Review of Petition**

Petitioner claims he received ineffective assistance of counsel in two respects. First, he claims the public defender's office had in the past represented prosecution witness Marlena Bruce. He claims his public defender therefore had a conflict of interest and could not effectively represent him. Second, he claims his counsel failed to impeach Marlena Bruce with two prior misdemeanor convictions.

A.  Review of Claim by State Courts

The claim was presented on direct appeal to the Fifth DCA.  On February 15, 2006, the Fifth DCA denied the claim in a reasoned opinion. (LD 5.) He then presented it to the California Supreme Court by petition for review. (LD 6.) The petition was denied on March 17, 2006. (LD 6.) The California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the Fifth DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

The appellate court first noted the issue was brought to the court's attention when Petitioner moved for appointment of substitute counsel pursuant to People v. Marsden, 2 Cal.3d 118 (1970). (LD 5 at p. 7.) Petitioner's counsel confirmed that Marlena Bruce was a potential witness and she had previously been represented by two other attorneys from the public defender's office with respect to two misdemeanors: 1) forgery involving a check; and 2) possession of drug paraphernalia. (LD 5 at p. 7.) However, his office "did not have a 'current file[]' on either charge" and the files were "'destroyed' and his office '[did not] have . . . access to any . . . information.'" (LD 5 at p. 7.) In addition, Marlena Bruce was "'off probation as of April 19 of 2004,' and the public defender's office '[did not] have any access to any confidential information that [it] could use against her.'" (LD

5 at p. 7.) Petitioner's counsel further stated: "'We did the usual thing. I called the bar hotline, and I ran [it] through our management, also. And we checked to see if we had existing files, and the determination was that we didn't have any conflict of interest.'" (LD 5 at p. 7.)

In analyzing the conflict, the appellate court cited the Supreme Court's decision in Cuyler v. Sullivan, 446 U.S. 335, 348 (1980), where the Court "made clear that [] a defendant must 'show[] that his counsel actively represented conflicting interests,' and 'the *possibility* of conflict is insufficient to impugn a criminal conviction.'" (LD 5 at p. 8.) The appellate court noted that the California Constitution applies an even more rigorous standard of review: "Regardless of an objection, 'even a potential conflict may require reversal if the record supports 'an informed speculation' that [Petitioner's] right to effective representation was prejudicially affected. Proof of an 'actual conflict' is not required.'"(LD 5 at pp. 8-9, *citing* People v. Mroczko, 35 Cal.3d 86, 104 (1983)). The Fifth DCA stated that "*Sullivan* requires an inquiry into whether the record shows that counsel 'pulled his punches,' i.e., failed to represent defendant as vigorously as he might have had there been no conflict.' [Citation.]" (LD 5 at p. 9.)

Applying these principles, the appellate court found Petitioner had not established he was denied his right to effective assistance of counsel on conflict of interest grounds. (LD 5 at p. 11.) First, defense counsel did fail to impeach Marlena Bruce with her prior forgery offense. However, this was not due to any solicitude or loyalty counsel may have felt for a former client of his office; rather, the court found it was due to counsel's own misunderstanding of the law. Second, counsel did not obtain any confidential information concerning Marlena Bruce because no such information existed; therefore, no potential or actual conflict resulted.

With respect to counsel's failure to impeach Marlena Bruce with her forgery conviction, the court assumed without deciding that counsel's performance was deficient. (LD 5 at p. 12.) Nevertheless, the court found no prejudice, as recited below:

> According to Bruce's account of events, as related in her testimony and the testimony of Officer Hayes, [Petitioner] left Bruce's apartment with an empty milk carton prior to the time that, according to other evidence, he purchased gasoline and pumped it into a "container"; he threatened to kill Drohn; and he returned to Bruce's apartment at around the time of the fire, at which time he admitted that he had set fire to a "vehicle" at Johnson's house. However, the record contains, in addition to this evidence, evidence of the following: The store clerk identified [Petitioner] as purchasing gasoline and a one-quart bottle of King

Cobra malt liquor approximately one hour before a fire was set underneath Frank Drohn's truck, which was parked outside Claudia Johnson's house; [Petitioner] pumped the gasoline into a container; an incendiary device contructed from a one-quart "Cobra beer bottle," gasoline and cloth were found underneath Drohn's truck; the cloth found in the bottle was consistent with that of a shirt [Petitioner] was wearing, the sleeves of which were in tatters; [Petitioner] bore some animosity toward Drohn and had "had words" with him; [Petitioner] had threatened to "burn [Johnson] and [her] kids out of the house"; [Petitioner] telephoned Johnson at about the time of the fire and apologized, but did not say what for; [Petitioner] was outside Johnson's house the evening of the fire; and he was intoxicated.

Even if the jury had not credited Bruce's account of events, given the overwhelming evidence of [Petitioner's] guilt on counts 1 and 2 as summarized above, it is not reasonably probable that the jury would have failed to convict [Petitioner] on those counts. Therefore, with respect to counts 1 and 2, [Petitioner] was not prejudiced by counsel's failure to impeach Bruce.

[Petitioner's] conviction for making a criminal threat against Bruce as alleged in count 3 stands on a different footing. The only direct evidence that [Petitioner] threatened Bruce was Bruce's claim that he did so, as related in her testimony and the testimony of Officer Haynes. Therefore, Bruce's credibility was of critical importance with respect to count 3. However, the evidence counsel is faulted for not introducing, viz., Bruce's conviction of misdemeanor forgery, is of relatively little probative value on the issue of Bruce's credibility. "In general, a misdemeanor - or any other conduct not amounting to a felony - is a less forceful indicator of immoral character or dishonesty that is a felony." [Citation.] Moreover, the fact that Bruce committed a misdemeanor act of forgery "had nothing to do with the facts at issue in the trial." [Citation.] And "[w]hile collateral matters are admissible for impeachment purposes, the collateral character of the evidence reduces its probative value. . . ."

In our view, although it is possible that the introduction of misdemeanor - conduct impeachment evidence would have led the jury to disbelieve Bruce, given the relatively low probative value of such evidence, such a result is not reasonably probable. Therefore, [Petitioner] has not met his burden of establishing that counsel's conduct was prejudicial with regard to the count 3 offense.

(LD 5 at pp. 12-13.)

B.  Strickland Standard

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an

objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different," 466 U.S., at 694. Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail. However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance. See Strickland, 466 U.S. at 692; United States v. Cronic, 466 U.S., at 659, and n. 25, 104 S.Ct., at 2046-2047, and n. 25 (1984).

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [United States Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. The habeas corpus applicant bears the burden to show that the state court applied United States Supreme Court precedent in an objectively unreasonable manner. Price v. Vincent, 538 U.S. 634, 640 (2003).

U.S. District Court
E. D. California          cd                                              11

C.  Analysis of Claim

The state court determination was not contrary to, or an unreasonable application of, Federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d). The court properly analyzed Petitioner's conflict of interest claim under Cuyler and the principles set forth in Strickland. Petitioner fails to show that counsel actively represented conflicting interests. Other attorneys from the public defender's office represented witness Marlena Bruce in previous misdemeanor charges; however, the files had been destroyed or were otherwise unavailable. Therefore, there was no possibility that defense counsel obtained confidential information. Petitioner also fails to demonstrate that counsel's representation was adversely affected by the alleged conflict. It is true counsel failed to impeach Marlena Bruce with her forgery misdemeanor; however, the state court reasonably determined this was due to his own misunderstanding of the law.

Likewise, the state court did not unreasonably reject Petitioner's claim of inadequate representation due to his failure to impeach Marlena Bruce. Petitioner suffered no prejudice because of counsel's failure. As to counts 1 and 2, Bruce's testimony was not critical. In fact as discussed by the state court, there was overwhelming evidence of arson and possession of flammable materials independent of Bruce's testimony. As to count 3, Bruce's testimony was the only evidence that Petitioner had made a criminal threat against her. Nevertheless, the state court reasonably determined that the misdemeanor forgery conviction had nothing to do with the issues at trial and had little probative value on her credibility. The court found there was no reasonable probability that impeachment with this conviction would have resulted in the jury disbelieving Bruce. The state court's application of the principles set forth in Strickland and Cuyler was not objectively unreasonable.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED. It is FURTHER RECOMMENDED that the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

1  of the Local Rules of Practice for the United States District Court, Eastern District of California.
2  Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party
3  may file written objections with the court and serve a copy on all parties.  Such a document should
4  be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the
5  objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail)
6  after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to
7  28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified
8  time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th
9  Cir. 1991).

11      IT IS SO ORDERED.
12      **Dated:   August 3, 2008**     **/s/ Gary S. Austin**
     UNITED STATES MAGISTRATE JUDGE